**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **SARA LEMKE**, *et al.*, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>**CHANGE HEALTHCARE INC**., *et al.*,<br><br>         Defendants, | **CASE NO. 3:24 cv 00302**<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION** |

Plaintiffs Sara Lemke, Revival Therapy, P.C., EA Health Holdings, Inc., EA Health, LLC, Leading Edge Mental Health, Inc., Compassionate Concierge Physicians LLC, Clinicians of Color LLC, Center for Child Development Incorporated, Supportive Hands, Healing Minds, LLC ("Supportive Hands"), M.A.D. Billing, Inc. ("M.A.D. Billing"), and Carriageway L.P. ("Carriageway") (collectively, "Plaintiffs"),[1] individually and on behalf of all others similarly situated, and for their *Emergency Motion for a Preliminary Injunction* ("Motion"), state as follows:

## I.    INTRODUCTION.

Defendants UnitedHealth Group Inc., UnitedHealthcare, Inc., Optum, Inc., and Change Healthcare Inc. (collectively, "Defendants")—though, *inter alia*, a software program known as "TherapyNotes"—provide clearinghouse services for healthcare providers and pharmacies to

---

[1] Leading Edge Mental Health, Inc., Compassionate Concierge Physicians LLC, Clinicians of Color LLC, Center for Child Development Incorporated, Supportive Hands, Healing Minds, LLC, M.A.D. Billing, Inc., and Carriageway L.P. are sought to be added as Plaintiffs in the proffered Second Amended Complaint ("SAC"). If leave to file the SAC is not granted prior to the Court ruling on this Motion, then the Plaintiffs in the First Amended Complaint ("FAC") bring this Motion in reliance on the facts alleged in the FAC and the Affidavits filed in support of this Motion.

submit electronic health insurance claims to insurance companies, and then facilitate the electronic payment of claims from insurance companies back to providers. *See*, Plaintiffs' proffered Second Amended Complaint ("SAC"), ¶¶ 1, 35-36. Since, in this capacity, Defendants serve as the hub of a nationwide health insurance claims processing network, Defendants' "sprawling businesses touch nearly every aspect of health care" in this country.[2] *See*, SAC, ¶¶ 2, 65-66.

As revealed on February 21, 2024, however, Defendants were the target of a ransomware attack (the "Attack") that has rendered, and continues to render, Defendants' computer network inoperable (the "System Outage"). *See*, SAC, ¶¶ 3, 35. Due to the System Outage, software such as TherapyNotes is largely inoperable because, without access to Defendants' computer network, healthcare providers and pharmacies cannot use TherapyNotes (or similar software programs) to submit electronic health insurance claims (and receive payment in connection therewith). *See*, SAC, ¶¶ 3-4, 35. This has ground the insurance claims process to a halt and held up the processing and payment of insurance claims. *See*, SAC, ¶¶ 4, 37, 40, 42, 45, 51, 57, 61, 63, 65-66.

Despite repeated promises to restore access to their computer network in a timely manner, Defendants' computer network remains offline. For example, on March 7, 2024, Defendants claimed that "electronic payment functionality will be available for connection beginning March 15," and, that they would "reestablish connectivity to [their] claims network and software on March 18, restoring service through the week." *See*, SAC, ¶ 70. Yet, to date, these promises have not been fulfilled. *See*, Affidavit of Kristen Scragg ("Scragg Aff."), ¶ 4,

---

[2] NY Times Reed Abelson Feb. 26, 2024 A Cyberattack on a UnitedHealth Unit Disrupts Prescription Drug Orders, https://www.nytimes.com/2024/02/26/health/cyberattack-prescriptions-united-healthcare.html (last visited Mar. 13, 2024)

2

attached hereto as <u>Exhibit 1</u>; Affidavit of Kristin Holub ("Holub Aff."), ¶ 4, attached hereto as <u>Exhibit 2</u>; Affidavit of Andrea Diamant ("Diamant Aff."), ¶ 4, attached hereto as <u>Exhibit 3</u>.

The inability to submit electronic health insurance claims (and receive payment in connection therewith) has, and will continue to, harm healthcare providers and pharmacies—such as Plaintiffs and members of the putative class in this case (the "Class")—as well as patients and the public at large. *See, e.g.*, SAC, ¶¶ 4, 37, 40, 42, 45, 51, 57, 61, 63, 65-66. For example, without payments from insurance companies for services rendered, Plaintiffs lost the vast majority of their income streams, and faced extreme difficulty in meeting operational expenses. *See, e.g.*, Scragg Aff., ¶¶ 4-5; Holub Aff., ¶ 5; SAC, ¶¶ 37, 40, 42-43, 45-46, 50-52, 54-55, 57-58, 61, 63-64.   In fact, several Plaintiffs (or their employees) were forced to take pay cuts and/or withdraw funds from their retirement accounts (at a significant penalty) or use their savings just to meet their payroll obligations. *See, e.g.*, SAC, 37, 42, 45, 50, 57, 63.

Although some Plaintiffs were able to avoid financial ruin in the short-term, these sources of "stopgap" funding have now been depleted, and some Plaintiffs are on the brink of going out of business. *See, e.g.*, Scragg Aff., ¶¶ 4-5; Holub Aff., ¶ 5. Thus, any further delay in restoring access to Defendants' computer network will permanently destroy the businesses that some Plaintiffs and Class members spent years building. *Id*.

On top of this, most (if not all) private health insurance companies impose strict deadlines on when insurance claims must be submitted to be payable. *See, e.g.*, Diamant Aff., ¶¶ 5-6; SAC, ¶¶ 81-83.   But, due to Plaintiffs' and Class members' inability to submit electronic health insurance claims through Defendants' computer network, there is a substantial risk that Plaintiffs and Class members will be unable to meet these deadlines, which would permanently deprive them of compensation for the healthcare services they have rendered to patients. *Id*.

For these reasons, Plaintiffs and Class members simply cannot afford to wait any longer for Defendants to restore access to their computer network, as any further delay will irreparably harm them (and the patients they serve). Accordingly, Plaintiffs seek a preliminary injunction requiring Defendants to restore access to their computer network by a date certain and/or develop an alternative way through which Plaintiffs and Class members can submit health insurance claims (and receive payment in connection therewith) in a timely manner.

As set forth below, all required factors to be considered by the Court in connection with the issuance of a preliminary injunction weigh in favor of granting this Motion. Therefore, the Court should issue a preliminary injunction requiring Defendants to restore access to their computer network by a date certain and/or to develop an alternative way through which Plaintiffs and Class members can submit health insurance claims (and receive payment in connection therewith) in a timely manner.

## II.   LEGAL STANDARD.

In considering whether to issue a preliminary injunction, a court must weigh four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *E.g.*, *Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) (*aff'd sub nom. McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005)). Notably, these "four factors generally ought 'to be balanced against one another and should not be considered prerequisites to the grant' of a temporary restraining order" (or preliminary injunction). *E.g.*, *Blount Pride, Inc. v. Desmond*, 2023 WL 5662871, at *3 (E.D. Tenn. Sept. 1, 2023) (quoting *Leary v. Daeschner*, 228 F.3d 729,

4

736 (6th Cir. 2000)).[3]  As such, if "the Court is able to determine the propriety of a [preliminary injunction] by relying on fewer than all four factors, it may do so." *Id*.; *McCreary Cnty.*, 354 F.3d at 445 ("Federal Rule of Civil Procedure 52(c) requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue.") (internal quotations omitted).

## III.  ARGUMENT.

As explained below, all four factors weighed by the Court support the issuance of a preliminary injunction. Therefore, the Court should grant the Motion.

### A.  Plaintiffs Have a Substantial Likelihood of Success on the Merits.

"The first factor" considered by the Court in connection with Plaintiffs' request for a preliminary injunction requires Plaintiffs "to demonstrate a strong likelihood of success on the merits." *E.g.*, *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F.Supp.3d 633, 638 (E.D. Ky. 2021) (internal quotations omitted); *McCreary Cnty.*, 354 F.3d at 445. "Oftentimes, this factor is determinative," and can, on its own, support the issuance of a preliminary injunction." *See, e.g.*, *Beckerich*, 563 F.Supp.3d at 638 (citing *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020)); *Blount*, 2023 WL 5662871 at *3 (noting that, in *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310 (6th Cir. 1998), the Sixth Circuit affirmed "the district court's issuance of a preliminary injunction [solely] based on the district court's conclusion that the plaintiff showed a likelihood of success on the merits").

In this case, Plaintiffs assert several different causes of action against Defendants in connection with the Attack and subsequent data breach (the "Data Breach"), including theories

---

[3] Although *Blount* involved a request for a temporary restraining order, the same standards apply to both temporary restraining orders and preliminary injunctions. *E.g.*, *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F.Supp.3d 633, 638 (E.D. Ky. 2021) (citing *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008)).

based on negligence, breach of implied contract, bailment, and unjust enrichment. *See*, SAC, Counts I-V. Plaintiffs and the Class will almost certainly prevail on the merits with respect to at least some of these causes of action, as courts in this Circuit and nationwide have widely acknowledged the harms caused by data breaches, and have permitted recovery under the legal theories asserted in this case. *See, e.g.*, *Galaria v. Nationwide Mut. Ins. Co.*, 663 Fed. Appx. 384, 388-91 (6th Cir. 2016) (finding that the plaintiffs had standing to assert negligence and bailment claims due to the "substantial risk of harm, coupled with reasonably incurred mitigation costs," caused by a data breach); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325-28 (11th Cir. 2012) (permitting negligence, contract, and unjust enrichment causes of action in a data breach class action).

Moreover, Defendants openly acknowledge that the Attack and Data Breach occurred,[4] and there is no serious dispute that Plaintiffs' and Class members' personally identifiable information and financial account information ("PII"), and their personal health information ("PHI"), was compromised as a result. *See, e.g.*, SAC, ¶¶ 2-3, 33. In addition, Defendants, the American Medical Association, and the U.S. Department of Health and Human Services (among others) have all publicly acknowledged the "unprecedented disruption" caused by the System Outage. *See, e.g.*, SAC, ¶¶ 65-66, 70. Thus, the harmful effects of the ongoing System Outage are also largely beyond dispute.

For these reasons, Plaintiffs have demonstrated substantially "more than a mere possibility of success"; they have "established a strong likelihood that [they will] be successful on the merits." *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119

---

[4] UnitedHealth Group Inc., SEC Filing Form 8-K Filing, filed February 21, 2024.

F.3d 393, 402 (6th Cir. 1997)). Therefore, this factor weighs significantly in favor of granting the Motion.

**B.      Plaintiffs Will Be Irreparably Harmed in the Absence of the Requested Injunction.**

"After determining that a plaintiff has demonstrated a substantial likelihood of success on the merits of his underlying claim, the second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *E.g.*, *Certified Restoration*, 511 F.3d at 550; *McCreary Cnty.*, 354 F.3d at 445. In general, "a plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages," or where "the nature of the plaintiff's loss would make the damages difficult to calculate." *E.g.*, *Certified Restoration*, 511 F.3d at 550 (quoting *Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir.2002); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992)); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).

Courts in this Circuit have routinely acknowledged that "the impending loss or financial ruin of [a] business constitutes irreparable injury." *E.g.*, *Performance Unlimited*, 52 F.3d at 1382; *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (finding that irreparable injury existed where the plaintiffs' restaurant "would likely go out of business" because "such financial ruin qualifies as irreparable harm"); *Bokhari v. Metro. Gov't of Nashville & Davidson Cnty.*, 2012 WL 1165907, at *9 (M.D. Tenn. Apr. 9, 2012) ("The potential loss of the business and the loss of goodwill—it is clear that these things can amount to irreparable harm.") (collecting cases). Indeed, "the loss of [a] business is precisely the type of harm which

necessitates the granting of preliminary injunctive relief" because, otherwise, a decision on the merits "will be a meaningless or hollow formality."[5] *Performance Unlimited*, 52 F.3d at 1382.

Here, as a result of the System Outage, healthcare providers and pharmacies—such as Plaintiffs and Class members—cannot submit health insurance claims to insurers for payment. *See, e.g.*, Scragg Aff., ¶ 4; Holub Aff., ¶¶ 4-5; Diamant Aff., ¶¶ 4-5. Since these payments from insurance companies account for a substantial portion of Plaintiffs' and Class members' businesses, many Plaintiffs and Class members are unable to satisfy their operational expenses and are on the brink of financial ruin. *Compare*, Holub Aff., ¶ 5 (noting that 90% of Supportive Hands's income comes from Medicaid payments, which are not currently being processed) *with Midwest Family Clinic, Inc. v. Shalala*, 998 F.Supp. 763, 772 (E.D. Mich. 1998) (finding the irreparable injury factor satisfied where the plaintiffs asserted that they would "be forced out of business" "as a result of the suspension of Medicare payments" where "over 85% of their business [came] from Medicare payments"); *see also*, Scragg Aff., ¶ 4. Thus, without an injunction requiring Defendants to restore access to their computer network by a date certain and/or to develop an alternative way through which Plaintiffs and Class members can submit health insurance claims (and receive payment in connection therewith) in a timely manner, many Plaintiffs and Class members will almost certainly go out of business. *See, e.g.*, Scragg Aff., ¶¶ 4-5; Holub Aff., ¶ 5.

---

[5] Damages sustained in connection with the loss of a business are also difficult to quantify. *Warren*, 411 F.3d at 712 ("Even though it would seem that the [plaintiffs] could quantify their past lost profits…and seek money damages in compensation, future lost profits are much harder to quantify. Moreover, if these lost profits were of such a magnitude that the viability of their business were threatened…then the [plaintiffs] would indeed have no adequate remedy at law.") (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir.1970) ("Of course, [the plaintiff's] past profits would afford a basis for calculating damages .... But the right to continue a business in which [the plaintiff] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; [the plaintiff and his son] want to sell automobiles, not to live on the income from a damages award.")).

8

In addition, the System Outage does not just present a short-term cashflow problem. As noted above, most (if not all) private health insurance companies impose strict deadlines on when insurance claims must be submitted. *See, e.g.*, Diamant Aff., ¶¶ 5-6; SAC, ¶¶ 81-83. If an insurance claim is not submitted by the applicable deadline, it is considered "stale" and will not be paid by the insurer, as has already happened to M.A.D. Billing (and will continue to happen as time passes). *Id.* Accordingly, Plaintiffs and Class members have (and will continue to) *permanently* lose the ability to receive compensation for the services they render. *Id.*

Moreover, even if Plaintiffs and Class members could somehow weather the storm by cutting services or temporarily ceasing operations, doing so would harm their reputations and customer goodwill. These harms are also irreparable injuries. *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022) ("Interference with customer relationships and damage to reputation are precisely the sorts of injuries this circuit has said are difficult to quantify monetarily, and thus constitute irreparable harm."); *Bokhari*, 2012 WL 1165907 at *9; *Certified Restoration*, 511 F.3d at 550 (quoting *Basicomputer*, 973 F.2d at 512).

In sum, Plaintiffs have "provide[d] evidence that without this Court's intervention, [they] will be unable to operate [their] business[es] and the business[es] would suffer economic collapse or insolvency." *A1 Diabetes & Med. Supply v. Azar*, 2018 WL 7283329, at *4 (W.D. Tenn. Sept. 21, 2018) (*vacated and remanded on other grounds*, 937 F.3d 613 (6th Cir. 2019)). Therefore, Plaintiffs have "adequately shown that absent this Court's granting the injunctive relief requested, [they] will suffer irreparable injury." *Id.*

**C.    The Public Will Be Irreparably Harmed in the Absence of the Requested Injunction.**

"The last two factors in the injunctive relief framework involve the interests of nonparties." *E.g.*, *Beckerich*, 563 F.Supp.3d at 644; *Certified Restoration*, 511 F.3d at 550-51

9

("The third factor for a court to consider is whether the issuance of the injunction would cause substantial harm to others," and "the final factor…is whether the public interest would be served by the issuance of the injunction.") (internal quotations omitted); *McCreary Cnty.*, 354 F.3d at 445; *Certified Restoration*, 511 F.3d at 550-51 (Here, "there is no indication that a preliminary injunction" would harm any third-party or the public at large).

In this case, however, the requested injunction is necessary to *prevent* harm to third-parties and the public.

First, there are significant public interests in "ensuring that [healthcare] suppliers are not forced to close [their] doors, that employees do not lose their jobs, and[] patients receive continued service (especially where, as here, the quality of healthcare service…is not at issue)." *A1 Diabetes*, 2018 WL 7283329 at *5; *Midwest Family Clinic*, 998 F.Supp. at 771 (weighing the facts that "if payments are suspended, numerous employees will leave or have to be laid off," and that patients would "be harmed in their future ability to" receive care, in favor of granting a preliminary injunction). Indeed, if Plaintiffs and Class members are forced to cease operations—whether temporarily or permanently—it will leave a substantial number of patients without access to critical healthcare, and many employees without jobs.

For example, Plaintiff Carriageway provides clinical laboratory testing services for nursing homes, assisted living facilities, home health care, health clinics, and outpatients, and serves hundreds of patients each day. *See*, Scragg Aff., ¶ 3. Carriageway's laboratory services are a vital and necessary part of these patients' medical care and treatment decisions, and there is no other local laboratory that can provide the laboratory services that Carriageway provides. *See*, Scragg Aff., ¶ 5. Accordingly, if Carriageway ceases operations, hundreds (if not thousands) of patients will lose access to important diagnostic testing, putting their health in jeopardy. *Id.*

10

Similarly, Plaintiff Supportive Hands is a mental healthcare provider that receives approximately 90% of its income from Medicaid patients. *See*, Holub Aff., ¶¶ 3, 5. Thus, if Supportive Hands goes out of business, it will leave some of the most vulnerable members of the public—low-income individuals with mental health issues—without essential mental health care. *Id*.

Given Defendants' integral role in "healthcare operations across the country," the harm that would be caused if Supportive Hands and Carriageway could no longer provide vital healthcare services to their patients is but a fraction of the harm that would manifest nationwide in the absence of the requested injunction. *See*, SAC, ¶¶ 2, 65-66. Therefore, the requested injunction would overwhelmingly promote the public interest. *See, e.g.*, *Parents' League for Effective Autism Services v. Jones-Kelley*, 339 Fed. Appx. 542, 552 (6th Cir. 2009) (affirming grant of preliminary injunction enjoining new regulations that would limit mental health treatment for children where they "would suffer irreparable injury in the form of severe regression of symptoms if [those] services [were] no longer available, and [they] could not receive comparable services from other providers"); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 221 F. Supp. 3d 913, 922 (E.D. Mich. 2016) (*aff'd and remanded*, 900 F.3d 250 (6th Cir. 2018)) (denying request to enjoin a change in how a state calculated mental healthcare funding where granting the requested injunction would "cause possible harm to others, against the public interest, as damage could be suffered by other Medicaid recipients in the area"); *Cf. United States v. Hayes*, 227 F.3d 578, 582 (6th Cir. 2000) ("The mental health of the American citizen is a public good of transcendent importance.") (quoting *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996)) (cleaned up).

Second, given the economics involved, it is substantially likely that only the largest and most well-funded healthcare providers will be capable of surviving the System Outage in the absence of the requested injunction. *See*, SAC, ¶ 65 (discussing a press release from the American Medical Association acknowledging the disproportionate "impact on small and rural practices, as well as those that care for the underserved"). This will result in even more consolidation and monopolization of the United States' healthcare industry by the nation's largest providers, which will harm consumers and the public at large. *See, e.g.*, *Shaker v. Vill. Voice Media, Inc.*, 2005 WL 1277730, at *2 (N.D. Ohio May 26, 2005) ("The articulated policy behind state and federal antitrust laws is to promote free markets and fair competition and to protect consumers and competitors from restraint of trade and monopolies."); *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 549 (1980) (noting that "monopolies generally are against the public policies of the United States") (Stevens, J., concurring). This also weighs in favor of granting the Motion.

Finally, although, to a certain extent, the requested injunction would burden Defendants, "the need for delicate balancing of the equities to avoid injury to an innocent third party is absent from this case." *See, e.g.*, *West Bay Expl. Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1038 (6th Cir. 1990). Indeed, the ever-present risks of data breaches are well-known, and there is a substantial body of government and industry guidance designed to prevent them. *Resnick*, 693 F.3d at 1329 ("In this digital age, our personal information is increasingly becoming susceptible to attack. People with nefarious interests are taking advantage of the plethora of opportunities to gain access to our private information and use it in ways that cause real harm."); SAC, ¶¶ 29-31 (discussing government and industry guidance designed to prevent data breaches). Yet, Defendants failed to invest the necessary resources to adequately protect their

12

systems, adequately prepare for known threats, reasonably prevent the breadth and scope of the Data Breach, and, as is relevant for purposes of this Motion, timely restore access to their computer systems, despite repeated (broken) promises to do so. *See, e.g.*, SAC, ¶¶ 32, 69-70. Therefore, any burden on Defendants would be "of their own making." *See, e.g.*, *D.M. Rottermond Inc. v. Shiklanian*, 2021 WL 1087422, at *2 (E.D. Mich. Mar. 22, 2021); *West Bay*, 915 F.2d at 1038 ("Having acted in its own financial interest, it cannot now complain because it has been injured thereby.").

Moreover, in some respects, the requested injunction will actually *benefit* Defendants, as it will ensure that Plaintiffs and Class members can stay in business, thus reducing Defendants' liability in this case. Or, put more colloquially, under the circumstances present here, the burdens of complying with the requested injunction will constitute "an ounce of prevention" that will ultimately "be worth a pound of cure" to Defendants. *Cf. In re Naughton*, 2011 WL 4479478, at *1 (W.D. Mich. Sept. 6, 2011).

Regardless, for purposes of the Motion, Plaintiffs need not show that burdens on Defendants will be absent; they only need to show that the "the balance of the equities" weighs in favor of the requested injunction. *See, e.g.*, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019). Since, here, any burdens on Defendants are clearly outweighed by the other interests discussed above, this factor weighs in favor of granting the Motion.

## IV. CONCLUSION.

As set forth herein, all four factors considered by Court in connection with Plaintiffs' request for a preliminary injunction weigh in favor of granting the Motion. Therefore, the Court should issue a preliminary injunction requiring Defendants to restore access to their computer network by a date certain and/or to develop an alternative way through which Plaintiffs and Class

13

members can submit health insurance claims (and receive payment in connection therewith) in a timely manner.

Plaintiffs SARA LEMKE, REVIVAL THERAPY, P.C., EA HEALTH HOLDINGS, INC., EA HEALTH, LLC, LEADING EDGE MENTAL HEALTH, INC., COMPASSIONATE CONCIERGE PHYSICIANS LLC, CLINICIANS OF COLOR LLC, CENTER FOR CHILD DEVELOPMENT INCORPORATED, SUPPORTIVE HANDS, HEALING MINDS, LLC, M.A.D. BILLING, INC., and CARRIAGEWAY L.P., individually and on behalf of all others similarly situated,

s/ Brent S. Snyder
Brent S. Snyder BPR #021700
**DANNLAW**
*Of Counsel*
2125 Middlebrook Pike
Knoxville, TN 37921
(865) 264-3328
(865) 546-2777 facsimile
notices@dannlaw.com

Marc E. Dann (OH 0039425)*
Brian D. Flick (OH 0081605)*
**DANNLAW**
15000 Madison Avenue
Lakewood, OH 44107
Phone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr.*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
*firm@attorneyzim.com*

*\*Pro Hac Vice* Motion submitted

*Counsel for Plaintiffs and the Proposed Classes*

14

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2024, a copy of the foregoing *Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction* and all exhibits was filed electronically with the Clerk of Court and notice of this filing was sent electronically to:

Marc E. Dann at notices@dannlaw.com
Brian D. Flick at notices@dannlaw.com
DannLaw
15000 Madison Avenue
Lakewood, OH 44107

Thomas A. Zimmerman, Jr. at *firm@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602

*Co-Counsel for Plaintiffs and the proposed classes*

and on March 26, 2024 a copy of the foregoing was served upon the following parties via commercial carrier service, prepaid to:

CHANGE HEALTHCARE INC.
c/o CT Corporation System, Registered Agent
300 Montvue Road
Knoxville, TN 37919-5546

Optum, Inc.
c/o CT Corporation System, Registered Agent
1010 Dale Street
Saint Paul, MN 55117–5603

UnitedHealth Group, Inc.
c/o CT Corporation System, Registered Agent
1010 Dale Street
Saint Paul, MN 55117–5603

UnitedHealthcare, Inc.
c/o CT Corporation System, Registered Agent
1010 Dale Street
Saint Paul, MN 55117–5603

s/  Brent S. Snyder
    Brent S. Snyder BPR #021700
    DannLaw

*Co-Counsel for Plaintiffs and the Proposed Classes*

15

# EXHIBIT 1

DocuSign Envelope ID: 987ABD65-30F1-473F-82F7-77E28114A4BF

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**SARA LEMKE, REVIVAL THERAPY, P.C., EA HEALTH HOLDINGS, INC., and EA HEALTH, LLC,** individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

**CHANGE HEALTHCARE INC**., **UNITEDHEALTH GROUP INC., UNITEDHEALTHCARE INC., and OPTUM, INC.,**

       Defendants.

**CASE NO. 3:24 cv 00302**

**AFFIDAVIT OF KRISTEN SCRAGG IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Local Rule 65.01(b) I, Kristen Scragg, hereby certify and state as follows:

1.     I am over the age of 18 years and am competent to testify to the facts contained in this affidavit, which are based on my personal knowledge.

2.     I am an owner of Carriageway L.P., and I am familiar with Carriageway's normal business operations.

3.     Carriageway provides clinical laboratory testing services for nursing homes, assisted living facilities, home health care, health clinics, and outpatients. Carriageway provides these laboratory services to hundreds of patients each day, and Carriageway submits its insurance claims for these laboratory services to insurance companies through Change Healthcare's clearinghouse, which amounts to over 1,000 new claims each week.

4.     Due to the Change Healthcare data breach, Carriageway is unable to submit legitimate insurance claims through the Change Healthcare clearinghouse to insurance companies, and is unable to obtain payment for these claims. Carriageway has lost approximately 60% of its

DocuSign Envelope ID: 987ABD65-30F1-473F-82F7-77E28114A4BF

income because approximately 60% of Carriageway's income comes from the insurance claims that Carriageway has been unable to submit due to the data breach, and Carriageway is unable to bill those patients directly for the laboratory services. If Carriageway is not able to obtain immediate processing and payment of its insurance claims, there is a substantial risk that it will no longer be possible for Carriageway to provide these laboratory services.

5.     Carriageway provides these laboratory services to over 40 nursing homes and assisted living facilities within a 60 mile radius of Carriageway's physical location in Hubbard, Ohio. These laboratory services are a vital and necessary part of the medical care and treatment decisions for these nursing home and assisted living residents. There is no other local laboratory that can provide the laboratory services that Carriageway provides to these nursing homes and assisted living facilities, and the health of these residents will be put in jeopardy if Carriageway is not able to obtain immediate processing and payment of its insurance claims.

Further the Affiant Sayeth Not.

DocuSigned by:

*Kristen Scragg*

4BDD72315E9A40F...

Kristen Scragg

# EXHIBIT 2

DocuSign Envelope ID: E63DBBA8-5498-487B-875F-D80660ADB437

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **SARA LEMKE, REVIVAL THERAPY, P.C., EA HEALTH HOLDINGS, INC., and EA HEALTH, LLC,** individually and on behalf of all others similarly situated, | **CASE NO. 3:24 cv 00302** |
| Plaintiffs, | **AFFIDAVIT OF KRISTIN HOLUB IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| **CHANGE HEALTHCARE INC.,  UNITEDHEALTH GROUP INC.,  UNITEDHEALTHCARE INC., and  OPTUM, INC.,** | |
| Defendants. | |

Pursuant to Local Rule 65.01(b) I, Kristin Holub, hereby certify and state as follows:

1.     I am over the age of 18 years and am competent to testify to the facts contained in this affidavit, which are based on my personal knowledge.

2.     I am the owner of Supportive Hands, Healing Minds, LLC ("Supportive Hands"), and I am familiar with Supportive Hands' normal business operations.

3.     Supportive Hands provides mental health services to its patients. Supportive Hands submits its insurance claims for these mental health services to insurance companies through Change Healthcare's clearinghouse.

4.     Due to the Change Healthcare data breach, Supportive Hands is unable to submit legitimate insurance claims through the Change Healthcare clearinghouse to insurance companies, and is unable to obtain payment for these claims.

5.     The majority of Supportive Hands' patients are Medicaid patients, and Supportive Hands cannot bill them directly for their mental health services. Approximately 90% of Supportive

DocuSign Envelope ID: E63DBBA8-5498-487B-875F-D80660ADB437

Hands' income comes from these Medicaid patients. If Supportive Hands is not able to obtain immediate processing and payment of its insurance claims, Supportive Hands will no longer be able to provide needed mental health services to its patients, which will risk putting these patients' health in jeopardy.

      Further the Affiant Sayeth Not.

DocuSigned by:

*Kristin Holub*

1674730F2A614BE...

Kristin Holub

# EXHIBIT 3

DocuSign Envelope ID: EAD900E7-50F2-4197-BB06-9D135F95B13B

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **SARA LEMKE, REVIVAL THERAPY, P.C., EA HEALTH HOLDINGS, INC., and EA HEALTH, LLC,** individually and on behalf of all others similarly situated, | **CASE NO. 3:24 cv 00302** |
| Plaintiffs, | **AFFIDAVIT OF ANDREA DIAMANT IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| **CHANGE HEALTHCARE INC**., **UNITEDHEALTH GROUP INC., UNITEDHEALTHCARE INC., and OPTUM, INC.,** | |
| Defendants. | |

Pursuant to Local Rule 65.01(b) I, Andrea Diamant, hereby certify and state as follows:

1.      I am over the age of 18 years and am competent to testify to the facts contained in this affidavit, which are based on my personal knowledge.

2.      I am the owner of M.A.D. Billing, Inc., and I am familiar with M.A.D. Billing's normal business operations.

3.      Change Healthcare, Inc. provides claims management for healthcare providers, such as hospitals, pharmacies, physicians, and other healthcare providers. M.A.D. Billing provides healthcare billing and insurance claims processing services to 15 healthcare providers, and M.A.D. Billing submits these healthcare providers' insurance claims to insurance companies through Change Healthcare's clearinghouse.

4.      Due to the Change Healthcare data breach, M.A.D. Billing is unable to submit legitimate insurance claims through the Change Healthcare clearinghouse to insurance companies, including to Healthfirst, Inc.

5.     Due to the Change Healthcare data breach, M.A.D. Billing was unable to submit legitimate insurance claims through the Change Healthcare clearinghouse to Healthfirst so that they were received by Healthfirst within Healthfirst's "timely filing" deadline. As a result, these claims are "stale" and Healthfirst will not pay these claims, even though these are legitimate claims that should be paid by Healthfirst. These claims became "stale" due to no fault of M.A.D. Billing; rather, they became "stale" as a direct result of the data breach.

6.     To the best of my knowledge, information, and belief, neither Healthfirst nor any other insurance company has extended their "timely filing" deadlines for claims that become stale due to the data breach.

Further the Affiant Sayeth Not.

_Andrea Diamant_
Andrea Diamant