**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| |
|---|
| SARA LEMKE, *et al.*, |
| |
| *Plaintiffs*, |
| |
| v. |
| |
| CHANGE HEALTHCARE INC., *et al.*, |
| |
| *Defendants*. |

Civil Action No. 3:24-CV-00302

Judge Eli J. Richardson

Magistrate Judge Barbara D. Holmes

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR A**
**<u>PRELIMINARY INJUNCTION</u>**

Plaintiffs' Motion for Preliminary Injunction ("Motion") should be denied because it falls well short of the Sixth Circuit's stringent standard for obtaining extraordinary, injunctive relief. Doc. No. 24. Plaintiffs filed their Motion alleging they face challenges with submitting electronic health claims for payment following a February 2024 cyberattack ("Cyberattack") on Change Healthcare Inc. ("Change").[1] Plaintiffs insist that this Court must grant an injunction requiring Defendants to "restore access to their computer network by a date certain and/or to develop an alternative way through which Plaintiffs and Class members can submit health insurance claims (and receive payment in connection therewith) in a timely manner." Mot. at 2. But Plaintiffs' Motion disregards numerous widely publicized facts regarding the very relief they seek. Specifically, Defendants have already (i) restored numerous electronic claims processing systems, (ii) created alternative workarounds for systems that are still being restored,[2] and most critically for purposes of the Motion, (iii) developed a program offering temporary funding to providers to fill the gap in any missed claims payments.

Plaintiffs ignore Defendants' established restorations, workarounds, and funding program, which could provide them with the very relief they seek, thereby dooming their Motion. Even setting that failure aside, the Motion still does not clear the high bar necessary for the issuance of a preliminary injunction for at least three reasons:

---

[1] Plaintiffs have sued Change, UnitedHealth Group Incorporated ("UHG"), UnitedHealthcare, Inc. ("UHC"), and Optum, Inc. ("Optum") (collectively, "Defendants"). While Defendants respond collectively for purposes of this Opposition, they reserve all rights to raise any and all objections and defenses to the allegations and claims made in the Second Amended Complaint and/or any forthcoming complaint. Plaintiffs have also named HealthFirst, Inc. as a Defendant.

[2] As discussed *infra*, Section III.3., Plaintiffs' Second Amended Complaint devotes two sentences to Plaintiffs' use of "TherapyNotes," a software program that allows providers to submit insurance claims for payment of services rendered to patients. Defendants have offered a workaround for this system, and Plaintiffs have not yet identified any other application or platform that the Named Plaintiffs utilized to submit claims.

*First,* Plaintiffs have not—and cannot—demonstrate that there is a substantial likelihood that they will succeed on the merits of this case. Plaintiffs ask this Court to adopt a strict liability standard—namely, because the Cyberattack occurred, Defendants must be liable. Not only is this position fundamentally flawed, but also Plaintiffs fail to identify case law from *any* court that has granted success on the merits at the summary judgment stage or later in a large-scale data breach matter. Instead, Plaintiffs erroneously rely on cherry-picked data breach cases in which plaintiffs established Article III *standing* or survived the *pleadings* stage as a purported basis for why Plaintiffs have a substantial likelihood of succeeding on the *merits* of this case.

*Second,* Plaintiffs fail to show that they have suffered irreparable injury. As addressed above, their Motion omits critical facts demonstrating that Defendants have already provided or are attempting to provide the requested relief. Consequently, despite Plaintiffs' assertion that the "harmful effects" of the Cyberattack are "beyond dispute," Defendants' prophylactic measures are significant and offer Plaintiffs relief from any effects they purportedly face. For example, Plaintiffs will not face "financial ruin" if they engage in the robust funding assistance program that Defendants have made available or accept the funds that Defendants offered Plaintiffs prior to Plaintiffs filing this lawsuit. Pls.' Mem. at 3, 8. Defendants have endeavored to communicate with Plaintiffs' Counsel to explain this information and to help facilitate this process, but until the day before this filing deadline, they were met with silence.[3] Moreover, even assuming Plaintiffs have faced harm, such harm could be remedied with money damages or through the already existing relief that Defendants have made available to Plaintiffs.

---

[3] Defendants repeatedly have offered provider Plaintiffs assistance in navigating the restorations, workarounds, or funding programs. On April 8, 2024, Plaintiffs' counsel reached out for the first time to take Defendants up on that offer. Defendants remain committed to providing assistance to both provider Plaintiffs in this suit and providers across the country generally.

*Third*, Plaintiffs fail to meet their burden to show that the threatened injury outweighs the harm an injunction would inflict on Defendants. In particular, Plaintiffs disregard the harm that Defendants would confront if forced to prematurely bring systems back online after the Cyberattack before sufficient diligence was completed, and the potential downstream effects that providers and individuals seeking care might also face under those circumstances.

Finally, Plaintiffs cannot show that the injunction sought would serve the public interest for similar reasons as those identified above. In particular, short-circuiting the established, and continually progressing, restoration process Defendants have enacted could result in ripple effects throughout the healthcare system, inviting negative effects on Defendants, providers, and individuals seeking care. Plaintiffs improperly discount those risks and the possible complications associated with bringing Defendants' systems back online prematurely.

Plaintiffs cannot meet their heavy burden of showing that the drastic remedy of a preliminary injunction is warranted. Their Motion should be denied.

## I.    Background

### 1.    The Cyberattack and Subsequent Restoration Efforts

Change, a UHG subsidiary, works across the health system to make clinical, administrative, and financial processes simpler and more efficient for consumers, providers, and payers by supporting, for example, pharmacy claims transactions, provider claims processing, and provider payments. Ex. 1, Decl. of Jeffrey P. Meyerhofer ("Meyerhofer Decl.") ¶ 3. On February 22, 2024, UHG announced in a Form 8-K filing with the SEC that Change had been the victim of a Cyberattack that UHG identified on February 21, 2024. *See* UnitedHealth Group Incorporated, Current      Report      (Form      8-K)      (February      22,      2024),

https://www.sec.gov/ix?doc=/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm (*last visited* April 9, 2024) (hereafter "UHG Feb. 22, 2024 8-K").

Defendants took prompt action on February 21 to contain the incident. *See* Information on the Change Healthcare Cyber Response, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/ns/changehealthcare.html (*last visited* April 9, 2024) (hereinafter "Change Information Center") (under "FAQs?"). Based on the ongoing investigation, there is no indication that any other UHG systems have been affected by this Cyberattack. *Id*. Numerous Change systems are back online, and others will be restored in the coming days and weeks. *See* Change Information Center (under "Product restoration"). By March 7, Change had restored 99% of Change pharmacy network services. UnitedHealth Group Cyberattack Status Update, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/newsroom/2024/2024-03-18-uhg-cyberattack-status-update.html (*last visited* April 9, 2024). And after consistent progress in the ensuing weeks, Change's core systems were back online and moving claims by March 27, and Defendants have provided in-depth information to customers, payers, trading partners, and direct submitters/channel partners regarding reconnecting. Change Information Center (under "Product restoration," "Latest updates," and "March – archive").

**2. Defendants' Temporary Funding Assistance Program**

In parallel, Defendants have worked to avoid harmful effects on individuals, providers, or payers due to the Cyberattack by quickly establishing funding assistance and developing and identifying robust workaround options. Meyerhofer Decl. ¶ 5. To help providers fill any short-term gap between pre- and post-Cyberattack claims payments, Defendants developed, and launched by March 1, 2024, the Temporary Funding Assistance Program for providers to access funding. *See* Meyerhofer Decl. ¶¶ 6, 9(a); Temporary Funding Assistance Program for Providers,

OPTUM, https://www.optum.com/en/business/providers/health-systems/payments-lending-solutions/optum-pay/temporary-funding-assistance.html (*last visited* April 9, 2024) (hereinafter, Optum Program Website). Defendants have already advanced nearly $4.7 billion to providers through this Temporary Funding Assistance Program. Meyerhofer Decl. ¶ 7. As described further below, Defendants offer and advance this funding on a weekly basis until the requisite services are restored, and providers generally receive disbursement by direct deposit within three to five business days. Meyerhofer Decl. ¶¶ 10, 17; Optum Program Website.

Providers may access funds in two different ways through the Temporary Funding Assistance Program. Meyerhofer Decl. ¶ 9; Optum Program Website (under "We've made it easier for providers to navigate this program"). "First, Defendants have proactively extended offers for predetermined amounts based on the difference between" providers' pre- and post-Cyberattack claims volumes. Meyerhofer Decl. ¶ 9(a). Defendants recognize, however, that they "only have partial visibility into providers'" pre- and post-Cyberattack weekly claims volume "and therefore are unable to see the full impact to providers" when proactively determining funding amounts. *Id.* ¶ 9(b). Consequently, Defendants created a second way for providers to access funds by submitting a "Temporary Funding Inquiry Form." *Id.* ¶ 9(c).[4] In the Temporary Funding Inquiry Form, providers may request additional funding assistance "in excess of the amount provided through predetermined offers." *Id.* Because the Temporary Funding Assistance Program is based on historical weekly claims data, offers are made on a weekly basis, meaning "if a

---

[4] The Temporary Funding Inquiry Form is easy to find and complete. It is prominently displayed in a blue banner on the Optum Program Website. Meyerhofer Decl. ¶ 9(d). The banner text is bolded, including the hyperlink to the "**temporary funding assistance inquiry form**." *Id.* Defendants also provide a phone number that providers can call for assistance with the process. *Id.* Defendants provide additional information regarding relief on the Change Healthcare and UnitedHealth Group websites. *See* Change Healthcare, *available at* https://www.changehealthcare.com; Change Information Center (under "Let us know how we can help" and "Additional Resources").

provider's need persists [or changes] over multiple weeks, it can accept funding or request additional funding each week." *Id.* ¶ 10.

Providers access the funding offers through an Optum Pay account. *Id.* ¶ 11; *see id.* ¶ 12 (describing Optum Pay). Many providers already have Optum Pay accounts. *Id.* ¶ 13. In fact, Revival Therapy, P.C.; Leading Edge Mental Health, Inc.; Compassionate Concierge Physicians LLC; Center for Child Development Incorporated; Supportive Hands, Healing Minds, LLC ("Supportive Hands"); and Carriageway L.P.—*all* the named provider Plaintiffs in this case—have Optum Pay accounts. *Id.* ¶ 16. "The Optum Pay system tracks providers by Taxpayer Identification Number (TIN)." *Id.* ¶ 14. Using providers' TIN(s), Defendants "work with providers to understand" the funding "already available to them and to identify additional steps that providers can take to secure funding," including by submitting a Temporary Funding Inquiry Form. *Id.* ¶¶ 9(c), 14. In an effort to ensure Plaintiffs obtain the assistance they need, Defendants notified Plaintiffs of these resources through counsel. *See* Ex. 2, Letter from Allison M. Ryan, Partner, Hogan Lovells US LLP, to Plaintiffs' attorneys of record (April 3, 2024) at 3 (unredacted version on file with counsel). Defendants likewise requested additional business information from Plaintiffs, such as Plaintiffs' TINs, to facilitate the funding process, but as of the date of this filing, Plaintiffs have not provided this information. *See id.*

Despite not receiving Plaintiffs' TINs, Defendants were able to use the names of the named provider Plaintiffs' businesses to identify some information regarding their efforts (or lack thereof) to access funds. Meyerhofer Decl. ¶ 15. Defendants identified at least one TIN associated with each named provider Plaintiff. *Id.* ¶¶ 16, 19–24. Defendants are able to track when providers have logged into their Optum Pay accounts, where providers can view the offers available to them on a tab devoted to the Temporary Funding Assistance Program. *Id.* ¶ 14. Based on Defendants'

records as of April 2, 2024, the provider "Revival Therapy, P.C. has not logged in to its Optum Pay account since at least March 1, 2024 [when the funding program launched,] and has not accepted the offer of assistance funding," nor has it "submitted a Temporary Funding Inquiry Form or request for funding." *Id.* ¶ 20.

As of April 2, 2024, Defendants had offered predetermined amounts to at least five of the six named provider Plaintiffs, meaning they were pre-approved to receive funds even without submitting a Temporary Funding Inquiry Form. *Id.* ¶ 18. Defendants located one TIN associated with the sixth named provider Plaintiff, Leading Edge Mental Health, Inc., and that TIN was not linked to any predetermined offer. *Id.* ¶ 24. However, "other TINs might be associated with this entity that could reveal a predetermined offer of assistance funding," and this provider "has not submitted a Temporary Funding Inquiry Form or request for funding associated with [the] TIN [identified]." *Id.* ¶ 24. Based on the located TINs, none of the other five named provider Plaintiffs have accepted all of the offers extended to them in their Optum Pay accounts. *Id.* ¶¶ 19–23. Two named provider Plaintiffs have logged into their accounts and accepted some—but not all—of the predetermined-amount offers associated with the located TINs, while three others have not accepted any of the funding offered to them. *Id.* ¶¶ 19–23. In addition to leaving funding offers on the table, only one named provider Plaintiff (Supportive Hands) submitted a Temporary Funding Inquiry Form seeking supplemental funding to make up any weekly gap in pre- and post-Cyberattack claims payments. *Id.* ¶¶ 19–24. Yet even Supportive Hands accepted *less* than what Defendants offered. *Id.* ¶ 22.

### 3. Existing Workarounds for Claims Submission

In addition to the available funding relief, Defendants also have established multiple workarounds for providers to submit claims for reimbursement, including via Optum, Inc.'s iEDI

solution. *Id.* ¶ 5; Ex. 2 at 2. Third parties also provide workarounds, including by using other clearinghouses. For example, TherapyNotes, LLC—the sole software platform that Plaintiffs point to as impacting them while Change restores its systems—has stated that it is using CLAIM.MD as an alternative clearinghouse. Pls.' Mem. 1-2; Change Healthcare Outage Update, THERAPYNOTES, LLC, https://blog.therapynotes.com/change-healthcare-incident-update (*last visited* April 9, 2024).

## II. Procedural History

Plaintiffs filed their initial Complaint on March 14, 2024, and amended for the first time four days later. *See* Compl., Doc. No. 1; Amended Compl., Doc. No. 12. Nearly two weeks later, on March 26, Plaintiffs filed the instant Motion. Mot. at 1; Pls.' Mem. Plaintiffs agreed to a fourteen-day period for Defendants to respond to the Motion. Joint Status Report, Doc. No. 34. On April 1, the Court issued an Order stating that Plaintiffs "have not made arguments justifying emergency relief compared to the normal (already extraordinary) relief of a preliminary injunction" because (i) Plaintiffs did "not explain why the irreparable harm . . . in this case is more significant than the alleged irreparable harm that underlies the myriad preliminary-injunction motions that do not receive this degree of expedited handling" and (ii) the "emergency" may be "of [Plaintiffs'] own making" given the passage of time since the initial Complaint on March 14. Order, at 1–2, Doc. No. 43.

## III. Argument

Plaintiffs have not satisfied their heavy burden to obtain a preliminary injunction, and all factors militate against granting their requested relief. First, Plaintiffs have assumed, rather than even attempting to demonstrate, a substantial likelihood of success on the merits. Second, Plaintiffs are unable to show that they have been harmed, much less irreparably, in light of the

evidence demonstrating Defendants' restoration efforts, the currently available workarounds, and funding assistance offered to providers—including the Named Plaintiffs, here. Third, Plaintiffs fail to show that the requested relief would prevent more harm than it would cause. Finally, the public interest counsels in favor of Defendants' current course rather than the sought injunctive relief.

### 1. Standard of Review

Plaintiffs have failed to "prov[e] that the circumstances clearly demand" such "an extraordinary remedy" as they seek here. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To obtain a preliminary injunction, a movant carries a "heavy" burden to meet four requirements, namely: (i) there is a substantial likelihood they will be successful on the merits; (ii) they would suffer irreparable injury absent the injunction; (iii) the balance of equities favors them; and (iv) the public interest supports an injunction. Pls.' Mem. 5; *Tactical Edge, LLC v. Garland*, 2023 WL 6393175, at *2 (M.D. Tenn. Sept. 29, 2023) (citations omitted); *Mathews v. Wedemeyer*, 2023 WL 4280927, at *3 (M.D. Tenn. June 29, 2023) (citations omitted); *Mize v. Sator*, 2012 WL 642743, at *3 (M.D. Tenn. Feb. 27, 2012). The Court need not even make specific findings for all four requirements when "fewer factors are dispositive of the issue." *Int'l Longshoremen's Ass'n, AFL-CIO, Loc. Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 903 (6th Cir. 1991) (reversing order of a preliminary injunction solely because plaintiffs did not show a likelihood of success or irreparable harm); *see also Tactical Edge LLC*, 2023 WL 6393175 at *3 (declining to conduct a full preliminary injunction analysis where plaintiff failed to establish a likelihood of success).

In reviewing a motion for preliminary injunction, the Court may consider the entire record, including affidavits and hearsay. *Tactical Edge LLC*, 2023 WL 6393175, at *2. As Plaintiffs'

cases recognize, the proof needed to obtain a preliminary injunction is "much more stringent than the proof required to survive [ ] summary judgment," which only requires establishing a genuine issue of material fact. *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 638 (E.D. Ky. 2021) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). Indeed, Plaintiffs cannot "merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Tactical Edge LLC*, 2023 WL 6393175, at *2.

For the reasons described herein, Plaintiffs have not satisfied their heavy burden to obtain a preliminary injunction, and all four requirements militate against granting their requested relief.

## 2. Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits

Plaintiffs fail to demonstrate a substantial likelihood of prevailing on the merits, which alone justifies denying their Motion. Their assertion that they "will almost certainly prevail on the merits" is divorced from any factual or legal support, and rests on (i) a one-sentence restatement of their causes of action, (ii) citation to two data breach decisions reviewing allegations at the pleadings stage, and (iii) their presumption that their or their patients' personally identifiable information (PII) and personal health information (PHI) were impacted at in the Cyberattack. Pls.' Mem. 5–7. Each of those purported justifications are seriously flawed, and such limited support cannot possibly suffice to demonstrate a substantial likelihood of success on the merits of their claims. Their terse assertion that they "will almost certainly prevail" on the merits at some point is "not enough . . . . They must show such likelihood *now*." *Patel v. AR Grp. Tennessee, LLC*, 2020 WL 5849346, at *6 (M.D. Tenn. Oct. 1, 2020) (emphasis in original).

First, although Plaintiffs list their causes of action, they fail to provide the required explanation as to how the relief they seek is connected to those causes of action, much less how their declarations support a substantial likelihood of success. *See Patel*, 2020 WL 5849346, at *6

(denying request for preliminary injunction and concluding that a party "simply must do more than file declarations with alleged facts and then leave it entirely to the Court to figure out how those facts relate to the party's particular claims and whether they likely would establish the party's claims"). In other words, they do not conduct "the work to explain why the evidence they have offered"—declarations on the purported lack of claims processing in the wake of the Cyberattack, Pls.' Mem. at Exs. 1–3—"is likely to establish" liability under either a negligence, breach of implied contract, bailment, or unjust enrichment theory arising from the Cyberattack. *See Patel*, 2020 WL 5849346, at *7; *see also Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994)). As in *Patel*, where the Court concluded that plaintiffs had not demonstrated a likelihood to succeed on the merits (let alone a "substantial likelihood"), "especially where . . . [they] have not bothered to explain why all elements" of their claims "are satisfied," this Court should reject Plaintiffs' strict liability view of the world, which wrongly assumes that Defendants are liable merely because the Cyberattack occurred, without even attempting to offer any factual support to back their claims up. *See Patel*, 2020 WL 5849346, at *6, 8. To be clear, Defendants do not believe Plaintiffs will ever succeed on the merits of their claims for numerous reasons, including but not limited to: Defendants have not breached any contractual or common law duty (to the extent a duty exists); Defendants have not violated any statute or other law; and Defendants have not been conferred any benefit at Plaintiffs' expense. Nor will Plaintiffs ever be able to establish causation or injury.

Second, Plaintiffs cite no case, and Defendants are aware of none, finding success on the merits at summary judgment or beyond in a large-scale data breach case. The two data breach

decisions that Plaintiffs cite do not show that courts—either in the Sixth Circuit or nationwide—"have permitted recovery" in such cases, as Plaintiffs erroneously suggest. Pls.' Mem. 6. For instance, *Galaria* is a non-precedential standing decision in which the Sixth Circuit had no occasion to reach the merits. *Galaria v. Nationwide Mut. Ins. Co.*, 663 Fed. Appx. 384, 388–91 (6th Cir. 2016).[5] And *Resnick* is an out-of-Circuit case in which the court merely held that the plaintiffs had adequately pled causes of action. *Resnick v. AvMed*, Inc., 693 F.3d 1317, 1327–28 (11th Cir. 2012). Plaintiffs' own parentheticals for these two cases acknowledge that they offer no support on the question of merits. Pls.' Mem. 6 (stating in parentheticals that *Galaria* found "that the plaintiffs had standing" and that *Resnick* "permitt[ed] negligence, contract, and unjust enrichment causes of action in a data breach class action"). Plaintiffs have done no more than offer the conclusory assertion that the Court should assume liability based on the ability of some plaintiffs to establish Article III standing (*Galaria*) or meet the Rule 12 notice pleading standards (*Resnick*).

Third, Plaintiffs compound their errors by assuming that their or their patients' PII and PHI were impacted in the Cyberattack. Pls.' Mem. 6. Setting aside that impact to PII and PHI has nothing to do with the relief sought arising out of gaps in claims processing, Defendants have not yet notified impacted individuals of whether their PII or PHI has been impacted.[6] Plaintiffs rely on an SEC filing from UnitedHealth Group Incorporated to support their contention that PII or

---

[5] In addition, currently pending before the Sixth Circuit is a petition for permission to file an interlocutory appeal seeking to challenge whether *Galaria* remains viable following the United States Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). *See In re: Warner, Norcross & Judd*, No. 23-0108 (6th Cir.).

[6] Defendants are currently working to issue timely notice as necessary under the relevant frameworks.

PHI has been disclosed, Pls.' Mem. 6 n.4.[7]  However, while that filing discloses the fact of the Cyberattack, it does not mention PII or PHI, let alone whether *Plaintiffs'* PII or PHI were impacted. *See* UHG Feb. 22, 2024 8-K.

At bottom, Plaintiffs have come nowhere close to bearing their burden to establish success on the merits, a failure that is "usually fatal" to a motion for preliminary injunction. *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (declining to consider whether plaintiff would otherwise be entitled to a preliminary injunction where plaintiff had no likelihood of success on the merits); *see also Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) ("A preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed[.]").

### 3. Plaintiffs Have Not Established That They Face Irreparable Harm

Plaintiffs also fail to demonstrate irreparable harm, which is "indispensable" to issuing a preliminary injunction, as they do not acknowledge, let alone dispute, (i) the restoration of certain Change's systems, (ii) the workarounds Defendants have made available to providers to permit them to continue submitting insurance claims as restoration efforts continue, and (iii) the billions of dollars in funding assistance that Defendants have offered to providers, including offers to the provider Plaintiffs here that they have not accepted.  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019); *see also Amacher v. Tennessee*, 2021 WL 5015803, at *3 (M.D. Tenn. Oct. 28, 2021) ("[T]he absence of irreparable injury is always fatal to a motion for a preliminary injunction[][.]").  "To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Sumner Cnty. Schs.*, 942 F.3d at 327; *see also Winter*

---

[7] Plaintiffs cite a UHG Form 8-K dated February 21, 2024, but there is no such filing.  Defendants presume that Plaintiffs are referencing UHG's Form 8-K filing on February 22, 2024. UnitedHealth Group Incorporated, Current Report (Form 8-K) (Feb. 22, 2024).

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (concluding that "[i]ssuing a preliminary injunction based only on a mere *possibility* of irreparable harm is inconsistent with" the extraordinary nature of this remedy, which requires a "clear showing" that plaintiff is entitled to relief (emphasis added)).  Moreover, a "plaintiff's harm is considered irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578.

Plaintiffs allege three harms, all of which boil down to an assertion that they have lost or might lose funds: (i) a potential loss of certain providers' businesses due to a purported inability to submit insurance claims and receive associated payments; (ii) damage to the providers' business reputations if they have to cut services or temporarily cease operations; and (iii) loss of compensation because certain claims processors are allegedly not able to submit the claims by the deadline imposed by an insurer.  *See* Pls.' Mem. 7–9.

As an initial matter, Plaintiffs have not met their burden to establish harm at all, much less irreparable harm.  Indeed, Plaintiffs' purported injuries can be adequately remedied (and are avoidable) if they rely on existing workarounds or accept existing funding offers.  *Cf.* Wright & Miller, Federal Practice and Procedure § 2948.1 ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the application is likely to suffer irreparable harm before a decision on the merits can be rendered.").  As noted, Defendants have restored numerous network systems since the Cyberattack.  And by March 27, Change's core systems were back online and moving claims, and Defendants provided in-depth information to customers, payers, trading partners, and direct submitters/channel partners regarding reconnecting.  *See* Change Information Center (under "Product restoration," "Latest updates," and "March – archive").

Even for systems that have not been restored, Defendants have endeavored to establish workarounds and provided information regarding those workaround options to providers. *See* Ex. 2 at 2. In particular, for TherapyNotes—the only platform/application mentioned in Plaintiffs' Motion—there are robust workaround options via Optum's iEDI solution and via CLAIM.MD. Change Healthcare Outage Update, THERAPYNOTES, LLC, https://blog.therapynotes.com/change-healthcare-incident-update (*last visited* April 9, 2024).[8]

In parallel to their restoration efforts, Defendants have established the Temporary Funding Assistance Program—a user-friendly program through which providers can obtain funds to fill gaps between pre- and post-Cyberattack claims payments. *See supra* Section II; Meyerhofer Decl. ¶ 6. Through this program, Defendants have already advanced nearly $4.7 billion to providers. Meyerhofer Decl. ¶ 7. And Defendants continue to offer support, including funding offers to provider Plaintiffs, which they have not accepted. *Id.* ¶¶ 18–24. For these reasons, Plaintiffs' cited authority simply does not apply. Pls.' Mem. 7 (citing *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995) (finding irreparable harm where uncontradicted evidence showed that defendants had not paid plaintiffs the contested royalties, subjecting plaintiffs to possible economic collapse) and *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (granting permanent injunction because defendants were continuing to restrict access to plaintiffs' business, and plaintiffs thus suffered a loss of past profits as well as future lost profits)).

---

[8] Beyond TherapyNotes, as of April 8, 2024, Plaintiffs have provided no information about the Change systems they suggest are inoperable sufficient to allow the Court to make a finding that Plaintiffs are unable to submit claims, much less information sufficient to order Defendants to restore unnamed (and therefore unknown) systems and services. Defendants stand ready to assist Plaintiffs and providers generally with the restoration and workaround processes, but cannot do so without understanding the basic facts about Plaintiffs' alleged hurdles—facts that are absent from the Motion and Declarations.

Plaintiffs tellingly fail to confront Defendants' provisions of relief. Although Plaintiffs acknowledge the financial assistance program in the Second Amended Complaint, they exclude those details from their Motion. *See* SAC ¶¶ 71, 75, Doc. No. 47. They also omit that Plaintiffs have failed to exhaust, and in some cases even access, the funding assistance offered by Defendants. Meyerhofer Decl. ¶¶ 19–23. Some Named Plaintiffs, including Compassionate Concierge Physicians LLC, have left funds Defendants offered to them on the table by logging in to their Optum Pay accounts but not accepting all of the pre-approved funds on a weekly basis. *Id.* ¶ 19. Defendants' searches using the Plaintiffs' business names and associated TINs also revealed that only one Named Plaintiff has submitted an inquiry form requesting additional funds beyond any pre-approved amounts. *Id.* ¶ 22. In an effort to ensure Plaintiffs obtain the assistance they need, Defendants notified Plaintiffs of these resources through counsel. *See* Ex. 2. Defendants likewise requested additional business information from Plaintiffs to help identify and facilitate funding for Plaintiffs. *See* Ex. 2 at 3. Plaintiffs have provided no information to allow Defendants to assist. Beyond this funding assistance, Defendants also reminded Plaintiffs about their significant restoration efforts as well as the workarounds they have made available to providers, including those providers that utilize TherapyNotes for purposes of submitting insurance claims. *See* Ex. 2 at 2. Plaintiffs again have yet to identify any other application or platform that the Named Plaintiffs have used. *See* Ex. 2 at 2. All of the existing resources show that, far from being irreparable, Plaintiffs' alleged harms are currently redressable without a preliminary injunction, and Defendants stand ready to assist.

None of the declarations that Plaintiffs submitted overcome this evidence. Plaintiffs first argue that "many Plaintiffs and Class Members are unable to satisfy their operational expenses and are on the brink of ruin" because claims payments are not being processed. Pls.' Mem. 8. For

this, they provide affidavits from Carriageway L.P. and Supportive Hands, Healing Minds, LLC—two of the Named Plaintiffs who accepted *less* than Defendants offered them. *See* Pls.' Mem., Exs. 1 ("Scragg Aff.") & 2 ("Holub Aff."); Meyerhofer Decl. ¶¶ 22–23; Ex. 2 at 3–4. Plaintiffs' affidavits contain only speculative statements regarding the certainty and immediacy of the irreparable harm, while evading the funding assistance that Defendants have offered them or any specific information as to the technical issues they are experiencing with regards to processing claims. *See, e.g.*, Scragg Aff. ¶ 4 ("If Carriageway is not able to obtain immediate processing and payment of its insurance claims, there is a substantial risk that it will no longer be possible for Carriageway to provide [its] laboratory services."); Holub Aff. ¶ 5 (noting that Supportive Hands is also seeking "immediate payment and processing of its insurance claims" and that "[i]f" it cannot obtain that relief it "will no longer be able to provide" its services). Those hypothetical statements are insufficient to establish that Plaintiffs' injuries are "certain and immediate," particularly with the funding available to them. *See Sumner County Schools*, 942 F.3d at 327 (affirming district court's conclusion that the "'ifs' [in plaintiffs' allegations] rule out the 'certain and immediate' harm needed for a preliminary injunction"). As in *Taylor*, where the court found that plaintiff's "conclusory statement" that "the discontinued payments have caused 'severe financial strain'" was insufficient to show irreparable harm, here too Plaintiffs' summary statements that they will not be able to provide services without the requested relief cannot carry their burden. *See Taylor v. Erie Ins. Co.*, 2018 WL 2770195, at *2 (E.D. Tenn. June 8, 2018) (Guyton, M.J.).

Plaintiffs next rely on a purported business reputational harm, alleging that if they survived in the short-term by cutting services or temporarily ceasing operations, they would suffer harm to their reputation and customer goodwill.[9] Pls.' Mem. 9. But in the cases that Plaintiffs rely on,

---

[9] As this brief makes clear, Plaintiffs need not cut services, nor temporarily cease operations. There is funding readily available to them. *See* Ex. 1.

defendants' conduct was the cause of the allegedly harmed customer goodwill or business reputation. *See ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503–04 (6th Cir. 2022) (describing defendant allegedly using plaintiff's intellectual property and "harming [plaintiff's] position in the marketplace"); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 509 (6th Cir. 1992) (finding loss of customer goodwill amounted to irreparable injury where ex-employees who signed non-competes removed customer information and contacted customers). Here, however, a third-party threat actor who perpetrated an attack on Defendants' systems—not Defendants themselves—would be the cause of Plaintiffs' speculated future breakdown in customer relationships. *See Sumner Cnty. Schools*, 942 F.3d at 327 (rejecting an alleged irreparable injury when it relied on intermediary steps). This Court's intervention is not needed to secure the relief Plaintiffs demand.

As for the Plaintiffs' alleged injury from overdue or "stale" insurance claims, this alleged harm is ultimately reparable by monetary damages and therefore cannot warrant the issuance of a preliminary injunction. *See* Pls.' Mem. 9, Ex. 3; *Overstreet*, 305 F.3d at 578 ("A plaintiff's harm . . . is [considered] irreparable if it is not fully compensable by monetary damages."). Indeed, Plaintiffs' supporting evidence, the affidavit from M.A.D. Billing, focuses heavily on the *retrospective* harm that M.A.D. Billing supposedly suffered. *See* Pls.' Mem., Ex. 3, ¶ 5. As with Plaintiffs' other affidavits, this affidavit offers no more than a scintilla of evidence, omitting details on the deadlines set by insurers or whether Plaintiff sought to submit the claims after the deadlines.

### 4. The Balance of the Equities Favors Defendants

In balancing the equities, "the Court must (1) balance the harm [p]laintiff would suffer if its request for a preliminary injunction were denied against the harm [d]efendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on

relevant third parties." *Patel*, 2020 WL 5849346, at *9 (citation omitted). Moreover, "[t]he purpose of a preliminary injunction is to preserve the status quo until a trial on the merits"—not disrupt it. *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Here, Plaintiffs assert that they seek to preserve the financial solvency of their businesses. *See* Pls.' Mem. 7–9. Yet, they ignore the remedies available to help ensure Plaintiffs' financial solvency—including through systems restoration, workarounds, and funding assistance—and they fail to adequately consider the burden on Defendants that would accompany a preliminary injunction. *See supra* Section II. Instead, Plaintiffs ask this Court to grant unprecedented relief on an "emergency" basis without explaining how the steps Defendants are pursuing to maintain the status quo would be any different than the sought relief.[10] *Cf. Bozin v. Deloitte Consulting LLP*, 2020 WL 4597260, at *3 (N.D. Ohio June 4, 2020) (denying motion for preliminary injunction in a data breach case when plaintiffs did "not identify the actions defendant would need to take in order to comply with the injunction").

Plaintiffs assert that requiring Defendants to bring their system back online ahead of schedule will "*benefit* Defendants" because helping businesses stay afloat will "reduc[e] Defendants' liability in this case." Pls.' Mem. 13. But disrupting the established restoration schedule would be extremely costly, and not merely "to a certain extent." *Id.* at 12. Moreover, as discussed further below, Plaintiffs ignore the risks associated with bringing online a system ahead

---

[10] Plaintiffs' attorneys appear to be applying a familiar playbook. *See Bozin v. Deloitte Consulting LLP*, 2020 WL 4597260, at *3 (N.D. Ohio June 4, 2020). *Bozin* was also a data breach case, and Plaintiffs' attorneys sought a broad preliminary injunction requiring the targeted company to generally "secure" Plaintiffs' information and to "prevent unauthorized access to it." *Id.* The court denied Plaintiffs' motion because it "did not satisfy Rule 65(d)'s specificity requirement." *Id.*

of schedule or the internal and opportunity cost associated with reallocating employees to reprioritize restoration efforts.

## 5. Public Interest

"The last factor in determining whether to grant a preliminary injunction 'asks whether the public interest is advanced in issuing' the requested injunction." *Patel*, 2020 WL 5849346, at *9 (citation omitted). Neither of the concerns that Plaintiffs identify in their Motion—the operation of the healthcare industry and the economic stability of healthcare providers—require the issuance of a preliminary injunction for these interests to be served. In fact, granting the requested relief could create risks for the public.

Although access to healthcare may be a public interest, that is not what is at stake in Plaintiffs' Motion. Instead, Plaintiffs' Motion concerns Plaintiffs' desires for certain, undefined technical restorations. But as described *supra*, there are restorations and workarounds in place, to say nothing of the financial assistance Defendants are offering to fill any funding gaps while the full restoration is completed.

Plaintiffs' own case law demonstrates that the mere fact that a preliminary injunction concerns healthcare is not dispositive, particularly where the relief sought could subject the public to greater risk.[11] What's more, the risks that Plaintiffs' requested relief could impose on the public favor a denial of their Motion. Specifically, while Defendants remain committed to following careful system restoration, the requested preliminary injunction, if ordered, would risk short-

---

[11] *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 221 F. Supp. 3d 913, 922 (E.D. Mich. 2016) (*aff'd and remanded*, 900 F.3d 250 (6th Cir. 2018)) (concluding that recipients of certain Medicaid services were not entitled to a preliminary injunction enjoining health agency's reduction of services, where the prior rate of services posed budgetary difficulties and the injunction could adversely affect other recipients); *Midwest Fam. Clinic, Inc. v. Shalala*, 998 F. Supp. 763, 772 (E.D. Mich. 1998) (declining to issue a preliminary injunction prohibiting the suspension of plaintiffs' Medicare payments because that relief could expose "a tremendous risk" of fraud).

circuiting this established, expert-driven, intentional, and continually progressing restoration process. To usurp this process and its dependencies in favor of only those systems impacting the Plaintiffs could adversely impact the restoration of systems generally. Plaintiffs improperly discount these system-wide risks and the possible complications associated with prematurely bringing certain claims processing back online.

Plaintiffs' speculative assertion that a preliminary injunction would prevent consolidation and monopolization in the healthcare industry also cannot save their Motion. While the cases they rely upon might address competition as a matter of policy, neither court did so in the context of reviewing a request for an extraordinary remedy like a preliminary injunction. *See Shaker v. Vill. Voice Media, Inc.*, 2005 WL 1277730, at *2 (N.D. Ohio May 26, 2005) (granting motion to dismiss); *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 549 (1980) (reviewing declaratory judgment concerning the constitutionality of a government agency's determination). As importantly, Plaintiffs offer no evidence of the widespread "consolidation and monopolization" they allege could occur following the Cyberattack, instead relying solely on a statement from the American Medical Association. *See* Pls.' Mem. 6. Such conjecture is not enough to establish that the requested relief is in the public's interest.

## IV. Conclusion

Plaintiffs have not satisfied their heavy burden to show that they are entitled to a preliminary injunction because they fail to establish a substantial likelihood of success on the merits, proffer irreparable harms, demonstrate that the balance of equities favors them, and demonstrate that the requested relief is in the public's interest. Because they have not shown that the "circumstances clearly demand" the sought "extraordinary remedy," the Motion should be denied. *Overstreet*, 305 F.3d at 573.

Dated: April 9, 2024

Respectfully submitted,

*/s/ Kimberly M. Ingram-Hogan*
E. Todd Presnell, BPR No. 17521
Kimberly M. Ingram-Hogan, BPR No. 35191
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 244-2582
F. (615) 252-4714
tpresnell@bradley.com
kingram@bradley.com

Allison M. Ryan*
Alicia J. Paller*
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
T. (202) 637-5600
F. (202) 637-5910
allison.holt-ryan@hoganlovells.com
alicia.paller@hoganlovells.com

Vassi Iliadis*
Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
T. (310) 785-4600
F. (310) 785-4601
vassi.iliadis@hoganlovells.com

*Applications for pro hac vice pending*

*Counsel for Defendants Change Healthcare
Inc., UnitedHealth Group Incorporated,
UnitedHealthcare, Inc., and Optum, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 9th day of April, 2024, the foregoing *Defendants' Opposition to Plaintiffs' Emergency Motion for a Preliminary Injunction* was filed electronically via the CM/ECF system, which will send notification of such filing to the following counsel of record:

Thomas A. Zimmerman, Jr.
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
firm@attorneyzim.com

Brent S. Snyder
DannLaw
2125 Middlebrook Pike
Knoxville, TN 37921
notices@dannlaw.com

Brian D. Flick
Marc E. Dann
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
notices@dannlaw.com

*/s/ Kimberly M. Ingram-Hogan*